UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
:
AGNES S.P. D'CUNHA, *pro se*, :
: <u>MEMORANDUM & ORDER</u>
Plaintiff, : 02-CV-5445 (DLI) (LB)
:
-against- :
:
NEW YORK HOSPITAL :
MEDICAL CENTER OF QUEENS, :
:
Defendant. :
:
-----------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

*Pro se* plaintiff, Agnes S.P. D'Cunha, brought this action against the defendant alleging employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. § 2000e *et seq*. Because plaintiff is a *pro se* litigant, the Court, in deciding this motion, has construed plaintiff's papers broadly, interpreting them to raise the strongest arguments suggested. *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 146 (2d Cir. 2002). For the reasons set forth below, defendant's summary judgment motion is granted in all respects.

**I.  Facts**

*Pro se* plaintiff, Agnes S.P. D'Cunha, is a registered nurse of Asian Indian descent. (Pl.'s Ex. 1 at 3.) She is employed by defendant New York Hospital Medical Center of Queens ("NYHQ"). (D'Cunha Dep. at 41, 55.) In August 2001, plaintiff worked in NYHQ's Operating Room ("OR") and was involved in a surgery at NYHQ wherein an item was left inside a patient, necessitating re-surgery. (D'Cunha Dep. at 138, 166.) In September 2001, plaintiff was

1

disqualified from working in the OR. (Ackerman Aff. Ex. L at 1.) Shortly thereafter, plaintiff was transferred from the OR to NYHQ's surgical unit. (D'Cunha Dep. at 188-91.) Plaintiff alleges that the decision to transfer her to the surgical unit constitutes discrimination based upon her race and national origin in violation of Title VII. Plaintiff further alleges that NYHQ engaged in retaliation based upon her complaints following the transfer.

### A. Operating Room Procedure

Many professionals participate in a single surgical procedure, including a circulating nurse and a scrub nurse. The circulating and scrub nurses are responsible for maintaining a "count"[1] of all sponges, sharps, softs,[2] and other surgical instruments used by the surgeon during an operation. (D'Cunha Dep. at 93-95; NYHQ Count Policy at ¶1.0.) The nurses perform such "counts" to ensure that foreign objects are not left in the patient after surgery is complete. (D'Cunha Dep. at 91.) The physician performing the surgery is not responsible for performing these "counts," but rather relies upon the nurses to do so. (*Id.* at 94-95.)

NYHQ's "Count Policy" enumerates specific mandatory "count" procedures to ensure that no items are unaccounted for at the end of surgery. (Count Policy at ¶ 1.0; D'Cunha Dep. at 83.) According to the "Count Policy," three "counts" must be conducted during an operation. (*Id.* at ¶ 4.6.) The initial count is conducted to "provide the baseline for subsequent counts." (*Id.* at ¶ 4.2.) The next count is performed immediately prior to closing the surgical incision. (*Id.* at

---

[1] A "count" is the process of literally counting all sponges, sharps, softs, and other surgical instruments used during surgery. (Count Policy at ¶¶ 4.1, 4.7)

[2] NYHQ's Count Policy defines a "sponge" as including "laparatomy pads, cottonoids, peanuts, cotton balls, raytec, tonsil sponges, vaginal packing, [and] intestinal 'stick' sponges." NYHQ Count Policy at ¶ 3.3. The policy defines a "sharp" as including "suture needles, scalpel blades and dermatome blades." *Id.* at ¶ 3.2. A "soft" includes "umbilical tapes, vessel tapes, penrose drains, suture reels, handless clamps, vessel cannulas, retractor tapes, and booties." *Id.* at ¶ 3.4.

¶ 4.7.) The final count is performed at the end of the surgical procedure. (*Id.*) During each count, the scrub nurse audibly counts and separates each item while the circulating nurse visually supervises the "count" of each item. (*Id.* ¶ 4.5.) This procedure ensures patient safety because any "unintended retention of a foreign substance in the [patient's] body after surgery may cause physical damage to the patient." (Count Policy at ¶ 4.4.)

    A. **The August 25, 2001 Miscount Incident**

On August 25, 2001, plaintiff worked as the scrub nurse during an operation of a patient who suffered a stab wound to the abdomen ("August 25 Operation"). (D'Cunha Dep. at 138, 148.) During this surgery, Karen Knizewski, R.N. ("Nurse Knizewski") served as the circulating nurse. (*Id.* at 145.) When plaintiff arrived in the OR, the initial lap pad[3] "count" had already been conducted by Nurse Knizewski and Nurse Sun Lee. (*Id.* at 142, 149.) Nurse Lee was the nurse "in charge" during the operation. (*Id.*) Plaintiff contends that she did not verify the lap pad "count" accuracy because two nurses had performed the initial count. (*Id.* at 153.) Following the surgery, Nurse Knizewski and plaintiff performed the second and third counts. (*Id.* at 162.) However, during the second and third counts, plaintiff did not visually observe Nurse Knizewski count each lap pad used during the surgery. ("August 25 Miscount Incident") (*Id.* at 162-64.)

Three days after the August 25 Miscount Incident, the patient became very ill. (D'Cunha Dep. at 163-64; Ackerman Aff. at ¶ 9; Cataldo Aff. at ¶ 3.) The patient was placed in NYHQ's surgical intensive care unit because he developed acute respiratory distress syndrome and was suffering organ failure. (Cataldo Aff. at ¶ 3; D'Cunha Dep. at 164-65.) A cat-scan of the patient revealed that a lap pad had been left in the patient during the August 25 Operation. (Cataldo Aff.

---

[3]     A lap pad or laparatomy pad is a small piece of linen cloth, approximately twelve inches by twelve inches, used to soak up or clean blood during an operation. (D'Cunha Dep. at 80-81).

3

at ¶ 3; D'Cunha Dep. at 169.) Therefore, reoperation was necessary to remove the lap pad. (Cataldo Aff. at ¶ 4; D'Cunha Dep. at 166.)

### B. **Plaintiff's Disciplinary Record is Dissimilar from Nurse Knizewski's Record**

Plaintiff's disciplinary record reveals that other than the August 25 Miscount Incident, plaintiff was involved in previous operations that required reoperation. In June 1993, plaintiff served as a scrub nurse during an operation where an unsterile cable was inserted into a patient. (Ackerman Aff. Ex. F; D'Cunha Dep. at 113-14.) Reoperation was necessary to remove the cable. (D'Cunha Dep. at 115.) Plaintiff received a written warning, stating that "further occurrence would lead to suspension or termination." (Ackerman Aff. Ex. F.) In December 1997, plaintiff served as the circulating nurse during an operation when an incorrect instrument "count" was recorded, resulting in a mammary clip being retained in the patient. (Ackerman Aff. Ex. G; D'Cunha Dep. at 122.) Again, reoperation was necessary to retrieve the clip. (Ackerman Aff. Ex. G; D'Cunha Dep. at 122.) In lieu of suspension, plaintiff received a second written warning. She was further required to review NYHQ's Count Policy and had to be supervised on her "count" procedure during three future operations. (Ackerman Aff. Ex. G; D'Cunha Dep. at 122-23.)

Plaintiff received numerous warnings for various other errors committed on the job. In July 1995, plaintiff received a verbal warning regarding a misplaced and unlabeled surgical pathology specimen. (Ackerman Aff. Ex. H; D'Cunha Dep. at 119.) In April 1998, plaintiff received a second verbal warning because plaintiff failed to complete a nursing assessment form and failed to obtain complete patient documentation. (Ackerman Aff. Ex. I.) In December 1999, plaintiff received a written warning for failing to properly refrigerate a specimen. (Ackerman Aff. Ex. J; D'Cunha Dep. at 132-33.) Moreover, plaintiff received a third verbal warning in

4

August 2001 regarding sick time abuse and "excessive absent[eeism]." (Ackerman Aff. Ex. K; D'Cunha Dep. at 73-74, 134.)

In contrast, Nurse Knizewski only received one verbal warning, for medication error, prior to the August 25 Miscount Incident. (Ackerman Aff. Ex. M.) Nurse Knizewski was not involved in any other operations requiring reoperation due to her misconduct. (Ackerman Aff. at ¶ 22.)

C. **Discipline Imposed on Plaintiff and Nurse Knizewski**

Following the August 25 Operation, the Clinical Director of Nursing, Perioperative Services, Nancy Ackerman, R.N. ("Nurse Ackerman"), instructed the OR nurse manager, Karen Cataldo, R.N. ("Nurse Cataldo"),[4] to investigate and determine how the lap pad was retained in the patient during the August 25 Operation. (Ackerman Aff. at ¶¶ 1, 10-13; Cataldo Aff. at ¶ 6.) Plaintiff and Nurse Knizewski were suspended indefinitely pending the outcome of NYHQ's investigation. (Ackerman Aff. Ex. C at 1; Ackerman Aff. Ex. D at 1; D'Cunha Dep. at 180-82.) During an investigative meeting with Nurse Cataldo, Nurse Knizewski acknowledged that she and plaintiff deviated from the NYHQ Count Policy during the August 25 Operation. (Cataldo Aff. at ¶ 7.) However, plaintiff "was unwilling to accept any responsibility for the presence of the lap pad in the patient." (*Id.* at ¶ 9.) After a full investigation, NYHQ determined that both plaintiff and Nurse Knizewski were responsible for the miscount that resulted in the lap pad being left in the patient. (Ackerman Aff. at ¶ 14; Ackerman Dep. at 12, 14, 22; Cataldo Aff. at ¶ 11.) Based on Nurse Ackerman's review of each nurse's personnel files, performance evaluations, and prior disciplinary records, she determined that serious disciplinary action was appropriate because plaintiff and Nurse Knizewski engaged in unsafe nursing practices and

---

[4] Both plaintiff and Nurse Knizewski reported to Cataldo. (Cataldo Aff. at ¶ 2; Pl.'s Ex. 25.)

5

violated NYHQ's policies and procedures. (Ackerman Aff. at ¶ 13-23.) Nurses Ackerman and Cataldo were concerned that plaintiff presented an OR patient safety risk if she were allowed to continue working as an OR nurse and "that [the] liability and risk was too much to assume." (Ackerman Dep. at 36; Cataldo Dep. at 51-53; D'Cunha Dep. at 244.)

Nurse Ackerman considered various forms of discipline as a result of plaintiff's misconduct. (Ackerman Aff. at ¶ 18-19.) Initially, Nurse Ackerman wanted to terminate plaintiff because plaintiff had previously received a total of seven warnings (four written and three verbal warnings), three of which were related to misconduct that required patient reoperation. (Ackerman Aff. at ¶ 18; Ackerman Dep. at 36.) However, in lieu of termination, plaintiff's indefinite suspension was converted to an eighteen-day suspension for poor performance and "failure to comply with AORN[5] and NYHQ standards of practice and standards of care." (Ackerman Aff. Ex. L; Ackerman Aff. at ¶ 19; D'Cunha Dep. at 184, 187.) NYHQ also disqualified plaintiff from working in the OR. (D'Cunha Dep. at 184-88.) Subsequently, plaintiff was transferred to NYHQ's surgical department where she continued working as a registered nurse. (D'Cunha Dep. at 188-91.) Although plaintiff was transferred to the surgical department, her shift, base salary, rate of pay, and benefits remained the same. (*Id.* at 184, 189.) However, she is no longer eligible for additional on-call pay ordinarily given to OR nurses as compensation for the inconvenience of being called into the OR at any time. (*Id.* at 189-90.) Thus, plaintiff's annual income was reduced by roughly $20,000.00. (*See* Pl.'s Ex. 35; D'Cunha Dep. at 189-90.)

---

5

The Association of periOperative Registered Nurses ("AORN") has a policy of recommended "count" practices that is similar to NYHQ's policy. (Ackerman Aff. Ex. B). These "count" practices are virtually identical to those contained within NYHQ's Count Policy. Plaintiff received certification from AORN as a certified OR nurse. (D'Cunha Dep. at 105).

After plaintiff's transfer to NYHQ's surgical department, NYHQ reported plaintiff's involvement in the August 2001 Miscount Incident to the New York State Department of Education's Office of Professional Discipline ("OPD"). (Ackerman Aff. Ex. O.) As a result of a separate investigation conducted by OPD, plaintiff was charged with "professional misconduct" in the August 25 Miscount Incident for "practicing of the profession of nursing with gross negligence . . . ." (Ackerman Aff. Ex. Q.) Plaintiff pled "no contest" to OPD's charge of "gross negligence." She was suspended for one month, fined $500, and placed on a two-year probation, of which twenty-three months were suspended. (*Id.*; D'Cunha Dep. at 185, 219.)

Given that Nurse Knizewski had not been involved in any other incidents requiring reoperation, Nurse Ackerman determined that Nurse Knizewski should be suspended for eight days and re-trained in OR procedures. (Ackerman Aff. Ex. N; Ackerman Aff. at ¶ 23; Ackerman Dep. at 35.) NYHQ also reported Nurse Knizewski to OPD. (O'Brien Reply Ex. DD.) Nurse Knizewski pled guilty to OPD's gross negligence charge. As a result of her guilty plea, Nurse Knizewski received a two-year license suspension, which was stayed indefinitely. She also received a concurrent term of probation and was fined $1,000. (O'Brien Reply Ex. FF.)

On or about June 8, 2002, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") against NYHQ, alleging unlawful retaliation and discrimination based on race, color and national origin. (O'Brien Aff. Ex. U.) At the conclusion of its investigation, the EEOC concluded that there was insufficient information to support plaintiff's allegations. (O'Brien Aff. Ex. V.) On or about July 11, 2002, the EEOC sent plaintiff a letter informing her of its conclusion and issued a "right-to-sue" letter. (*Id.*)

On October 9, 2002, within ninety (90) days after receipt fo the "right-to-sue" letter, plaintiff commenced this Title VII action alleging employment discrimination and retaliation on the basis of her race and national origin. Defendants now move for summary judgment

7

contending that plaintiff's temporary suspension from work and transfer to another position was completely appropriate because plaintiff's employment in the OR posed a serious patient safety risk.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S. Ct. 2505; *accord Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S. Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505. As the Court held in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

### B. Racial or National Origin Discrimination

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Hunter v. St. Francis Hosp.,* 281 F. Supp. 2d 534, 541 (E.D.N.Y. 2003) (citing 42 U.S.C. § 2000e-2(a)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 505, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

In Title VII cases where there is no direct evidence of discrimination, plaintiff's claims are analyzed under the burden shifting analysis set forth in *McDonnell Douglas. Hunter,* 281 F. Supp. 2d. at 541. Under the three-part burden shifting analysis, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. To establish a prima facie case, the employee must show that (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Hunter*, 281 F. Supp. 2d at 541 (citing *St. Mary's Honor Ctr.,* 509 U.S. at 507). Once plaintiff establishes a prima facie case, the employer is presumed to have discriminated against the employee. *Id.* at 542 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 506). The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason justifying the employment action. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Once the defendant meets this burden of production, "the presumption of discrimination 'drops out of the picture.'" *Id.* at 143 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511).

Because the burden of persuasion remains at all times with the plaintiff, the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination." *Reeves*, 530 U.S. at 143 (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). This showing must "be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 312 (2d Cir. 1997). Mere conclusory allegations of discrimination are not enough to defeat a motion for summary judgment. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

### 1. Plaintiff has Failed to Establish a *Prima Facie* Case

Here, plaintiff has not met the burden of establishing a prima facie case of discrimination. Although an Asian Indian is a member of a protected class, plaintiff has not demonstrated that she performed her job satisfactorily. In order to establish the second prong of a prima facie case, the plaintiff must demonstrate "satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance." *Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 30 (2d Cir. 1997). Plaintiff's record is peppered with numerous verbal and written warnings regarding her performance. (Ackerman Aff. Ex. F, G, H, I, K, J.)

In support of her claim of satisfactory job performance, plaintiff has submitted numerous letters she received from patients and patients' family members expressing their appreciation for her services. (Pl.'s Ex. 17.) However, it is the employer's performance evaluation that controls the analysis. *See Thornley*, 104 F.3d at 29; *see also Rosengarten v. J.C. Penney Co.*, 605 F. Supp. 154, 157 (E.D.N.Y. 1985) ("It is the perception of the decision-maker, not the plaintiff himself, which is relevant."). Moreover, prior evaluations giving plaintiff good reviews and letters of appreciation do not tend to show that her transfer and suspension was a product of discrimination. *See Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 192 (E.D.N.Y. 2002). Thus, these letters are not relevant evidence in determining whether plaintiff is capable

performing her job satisfactorily.

Moreover, plaintiff cannot establish a prima facie case by attempting to explain away the legitimacy of her poor performance reviews. *See Valentine v. Standard & Poor's,* 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999). Plaintiff attempts to introduce explanations for her lapse in attention during the August 25 Operation. Specifically, plaintiff states that she was "shaken" prior to the August 25 Operation because Nursing Supervisor Hernandez shouted at plaintiff in front of various patients. (*See* Memorandum of Law in Support of Plaintiff's Opposition to Motion for Summary Judgment at 6; Pl.'s Ex. 19 at 2; Pl's Ex. 24 at 10.) The court is not persuaded by plaintiff's attempts to introduce explanations for her lapse in attention during the August 25 Operation. Plaintiff had an obligation to perform her duties diligently. Moreover, criticism regarding work-related matters is not evidence of racism. *Taylor v. Polygram Records,* No. 94 CIV. 7689, 1999 WL 124456, at *17 (S.D.N.Y. March 8, 1999). Furthermore, other than the August 25 Miscount Incident, plaintiff's performance record is filled with blemishes, which illustrates that she has failed to meet NYHQ's performance criteria. Therefore, she has not established a prima facie case of discrimination under Title VII.

Even if plaintiff satisfied the second requirement of a prima facie case, she has not shown that she suffered an adverse employment action that gives rise to an inference of discrimination. Although plaintiff has shown an adverse employment action to the extent that she suffered an annual monetary loss of $20,000.00, *see Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (adverse employment actions include ". . . demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities. . .") (quoting *Crady v. Liberty Nat'l Bank & Trust Co. Of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993), plaintiff has failed to show that "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *St. Francis Hosp.*, 281 F. Supp. 2d at 541

11

(citing *St. Mary's Honor Ctr.,* 509 U.S. at 507).

Plaintiff indicates that the Nurse Cataldo made negative comments to plaintiff, such as "I have many things on you," " You should have been dismissed long time ago," and "I'll get you," and that Nurse Cataldo's "attitude" was "scary." (Memorandum of Law in Support of Plaintiff's Opposition to Motion for Summary Judgment at 11.) However, plaintiff's mere gut instinct and personally held beliefs regarding comments made by Nurse Cataldo are not enough to support a causal connection between those incidents and plaintiff's transfer from the OR. *See Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (no inference of discrimination where plaintiff alleged that her supervisor "smiled at her less approvingly"). Therefore, plaintiff has failed to establish a prima facie case of discrimination.

**2. Defendant Provided a Legitimate Explanation, but Plaintiff Failed to Show Pretext**

Assuming *arguendo* that plaintiff established a prima facie case, the defendant provides a legitimate explanation for plaintiff's transfer by stating that the decision was based upon plaintiff's "total work record," which raised serious concerns for patient safety. (Ackerman Aff. at ¶ 18; Ackerman Aff. Ex. L; Ackerman Dep. at 8, 36; Cataldo Dep. at 16-18, 51-53.) In order to prove that these reasons were a pretext for discrimination, the plaintiff has the burden to show both "that the reason was false, and that the discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). "It is not enough . . . to disbelieve the employer; the [reasonable] factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519. Plaintiff attempts to overcome this burden by showing that she received disparate treatment by comparing the disciplinary action taken against her, an Indian Asian nurse, with the action taken against Nurse Knizewski, a Caucasian nurse. (D'Cunha Dep. at 227.) However, the plaintiff must show that there were no mitigating circumstances or differences between the employees that might account for the disparate disciplinary action. *Droutman v. New York*

*Blood Ctr., Inc.*, No. 03-CV-5384, 2005 WL 1796120 at *10 (E.D.N.Y. Jul. 27, 2005). Moreover, the acts committed by any other similarly situated employees must have been of "comparable seriousness" to those acts committed by the plaintiff. *McDonnell Douglas,* 411 U.S. at 804. "Employees are not 'similarly situated' merely because their conduct might be analogized." *Droutman*, 2005 WL 1796120 at *10 (citing *Mazzella v. RCA Global Commc'n, Inc.,* 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986)).

Here, irrespective of Nurse Knizewski and the plaintiff's joint involvement in a single common operation error, their performance records clearly show that they are not similarly situated. Plaintiff has been involved in multiple operating procedure errors, three of which necessitated patient reoperation. (Ackerman Aff. Ex. C, F, G.) In contrast, Nurse Knizewski was only involved in one procedure that required reoperation, the August 25 Miscount Incident. While plaintiff has offered some evidence as to why she may have lacked concentration during the August 25 Operation, this evidence "does not raise an issue of fact regarding the overall legitimacy of the proffered explanation." *Taylor*, 1999 WL 124456, at *10. In fact, plaintiff does not dispute that these errors occurred, but instead attempts to shift the blame elsewhere or explain why she did not perform her duties diligently. However, shifting the blame for failing to perform one's job duties diligently does not establish pretext. *See Brown*, 194 F. Supp. 2d at 191. The hospital acted reasonably in disciplining Nurse Knizewski in a less severe manner based upon her nearly unblemished work record.

Since 1995, plaintiff committed serious errors on the job, three of which resulted in the reoperation of patients, and had been repeatedly warned that such mistakes could result in termination. (Ackerman Aff. Ex. F.) Despite such warnings, plaintiff continued to commit errors on the job. (Ackerman Aff. Ex. G; D'Cunha Dep. at 122-23.) Therefore, resolving all ambiguities and drawing all inferences in plaintiff's favor, no reasonable fact finder could find

disparate treatment.

**IV. Retaliation**

Plaintiff also raises a retaliation claim. Under Title VII, it is unlawful for employers to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Payne v. MTA New York City Transit Auth.*, 349 F. Supp. 2d 619, 629 (E.D.N.Y. 2004) (citing 42 U.S.C. § 2000e-3(a)). The *McDonnell Douglas* three-prong standard discussed above also applies to such claims. *Hunter v. St. Francis Hosp.*, 281 F. Supp.2d 534, 546 (E.D.N.Y. 2003).

> In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence . . . : (1) participation in a protected activity known to the defendant; (2) an employee action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."

*Id.* The requisite causal connection between participation in the protected activity and the alleged retaliation can be established by showing "(1) direct proof of retaliatory animus directed against the plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities." *Id.* at 547.

Plaintiff alleges eight different types of retaliatory action taken against her. First, she alleges that Nurse Cataldo said "I have lots of things [on you]." Plaintiff contends that this statement is evidence of retaliatory disciplinary actions taken against her. (D'Cunha Dep. at 232.) This statement alone cannot serve as the basis for a retaliation claim because Nurse Cataldo allegedly made this comment before plaintiff was involved in the August 25 Miscount Incident. (*Id.*) *See St. Francis Hosp.*, 281 F. Supp. 2d at 547 (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (an inference of retaliation does not arise where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity).

14

Next, plaintiff alleges retaliation for the hospital's failure to remove a verbal warning issued for excessive sick leave from her file. Plaintiff received this verbal warning on August 20, 2001. (Ackerman Aff. Ex. K.) The hospital issued a decision stating that the "verbal warning stands" on August 27, 2001, two days after the August 25 Operation. (Pl.'s Ex. 9.) Although the hospital's action regarding upholding the warning and the August 25 Miscount Incident are "close in time," plaintiff did not engage in any protected activity prior to NYHQ's refusal to remove this warning from plaintiff's record. *See St. Francis Hosp*. at 547. Participation in the August 25 Operation is not a protected activity. Moreover, NYHQ did not notify plaintiff of her removal from OR duty until September 7, 2001, and plaintiff did not file a discrimination claim against the hospital until June 8, 2002. (Pl.'s Ex. 1 at 6; Pl.'s Ex. 13.)

Plaintiff also submits two letters dated September 19, 2001 and September 27, 2001, addressed to Nurse Ackerman and NYHQ's Vice President of Nursing respectively. Plaintiff argues that defendant retaliated against her based on her claims of discrimination in these letters. However, these letters cannot constitute participation in a protected activity because they were created after the hospital rendered its decision to discipline plaintiff. (Pl.'s Ex. 19, 20.) *See St. Francis Hosp.*, 281 F. Supp.2d at 547.

Although plaintiff submitted a letter dated August 26, 2001,[6] describing the shouting incident with Nurse Hernandez, sent to Nurse Ackerman prior to the hospital's decision not to remove the verbal warning from plaintiff's record, the letter is not evidence of participation in a protected activity. To constitute a protected activity, plaintiff needed to possess a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. College of Physicians and Surgeons,* 842 F.2d 590, 593 (2d Cir.

---

[6] This letter is actually dated August 29, 2006, however, the date of this letter on the court's courtesy copy was crossed out and replaced with August 26, 2006. Since plaintiff is a *pro se* litigant, the court interprets the papers broadly.

1988) (citing *Abel v. Bonfanti,* 625 F. Supp. 263, 267 (S.D.N.Y. 1985); *Francoeur v. Corroon & Black Co.*, 552 F. Supp. 403, 412 (S.D.N.Y. 1982)); *ee also Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 291 (S.D.N.Y. 1999). Plaintiff's August 26th letter in no way expressed a belief that NYHQ engaged in an unlawful employment practice; rather, the letter was written prior to any adverse action taken against her and is merely an explanation of the plaintiff's view of events that took place on the day the miscount occurred. Therefore, there is no evidence to support plaintiff's allegation that the decision to uphold the warning was retaliation because plaintiff did not engage in a protected activity prior to the hospital's decision. *St. Francis Hosp.*, 281 F. Supp.2d at 547.

The third alleged instance of retaliatory conduct is that plaintiff's daughter was denied health care insurance. (Pl.'s Ex. 36.) However, plaintiff admits that she sent a letter on January 29, 2001 complaining of this problem, well in advance of any protected activity that she may have engaged in following the August 25 Miscount Incident. Because plaintiff had insurance coverage problems prior to her participation in a protected activity, the denial of coverage cannot constitute retaliatory action. *St. Francis Hosp.*, 281 F. Supp.2d at 547.

As a fourth example of retaliation, plaintiff points out that Long Term Disability deductions were taken from her 2003 and 2004 paychecks. (Pl.'s Ex. 37-39.) However, in order to make a case of retaliation without more evidence than just timing, the proximity between participation in a protected activity and the adverse action must be "very close." *St. Francis Hosp.*, 281 F. Supp.2d at 547 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citations omitted). Hence, courts have determined that action taken, by itself, one and one-half months later is sufficient, while more remote instances are not. *Clark Ct. Sch. Dist.*, 532 U.S. at 274 (action taken 20 months later insufficient); *O'Neal*, 237 F.3d at 1253 (quoting *Anderson v. Coors Brewing,* 181 F.3d 1171, 1179 (10th Cir. 1999))

(incident occurring three months later insufficient). *See also Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient). Given that these deductions were taken from her paycheck in 2003-2004, the temporal proximity between any protected activity and the accounting error is too far removed to establish retaliation without more evidence.

Plaintiff alleges that the hospital also took retaliatory action by not paying her for overtime. (Pl.'s Ex. 40.) However, plaintiff has failed to show that similarly situated employees always received their overtime pay. *St. Francis Hosp.*, 281 F. Supp.2d at 547 (establishing that a causal connection can be established by showing disparate treatment of similarly situated employees). In fact, plaintiff's own reply states that "[m]any times nurses are denied pay for overtime even if they sign out the time they finish the work." (Memorandum of Law in Support of Plaintiff's Opposition to Motion for Summary Judgment at 17.) Hence, plaintiff has failed to set forth any evidence suggesting that the denial of overtime pay was related to her participation in a protected activity.

Next, plaintiff contends that the hospital retaliated against her because they allegedly only reported her involvement, and not Nurse Knizewski's involvement in the August 25 Miscount Incident to OPD. However, NYHQ did also report Nurse Knizewski to OPD for her participation in the August 25 Miscount Incident. Moreover, OPD also took punitive actions towards Nurse Knizewski. (O'Brien Reply Ex. DD.) Plaintiff's subpoena shows that she misspelled Nurse Knizewski's name (Pl.'s Ex. 22.), which explains why plaintiff did not find any records of reported misconduct against the parties named on the subpoena. (Pl.'s Ex. 23.) Hence, the hospital did not engage in retaliation against plaintiff by reporting her misconduct to OPD.

As a seventh action, plaintiff alleges retaliatory action by arguing that she received low

ratings in her performance evaluations. (Pl.'s Ex. 57.) As evidence of this alleged retaliation, plaintiff has submitted a copy of the evaluation completed for the year during which the miscount incident occurred. (*Id*.) Regardless of whether plaintiff disagrees with these evaluations, negative evaluations alone cannot constitute an adverse employment action to establish a claim of retaliation, unless the evaluation is accompanied by adverse consequences. *Moore v. Potter*, 353 F. Supp. 2d 410, 415 (E.D.N.Y. 2005) (quoting *Pellei v. Int'l Planned Parenthood Federation/Western Hemisphere Region, Inc.*, No. 96 CIV. 7014, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999)). Here, the adverse action of transferring plaintiff out of OR had already occurred before the performance evaluation was conducted. Plaintiff makes no showing of any adverse consequence she suffered after complaining of discrimination in her various letters to superiors at NYHQ, after her EEOC filing, or after she commenced this lawsuit.

Lastly, plaintiff contends that the hospital's refusal to transfer her back to the OR constitutes retaliation. Plaintiff submitted a request to be transferred to the OR on March 25, 2004. (Pl.'s Ex. 64.) Given the passage of time between plaintiff's alleged participation in protected activities and the denial of the request to transfer, the court cannot say that these activities are "very close" in time. *St. Francis Hosp.*, 281 F. Supp.2d at 547 (quoting *Clark Cty. Sch. Dist.*, 532 U.S. at 273 (quoting *O'Neal*, 237 F.3d at 1253)). Moreover, following an investigation, the hospital determined that there was too much risk and liability for the hospital to allow Plaintiff to work in the OR. (Ackerman Dep. at 36; Cataldo Dep. at 51-53; D'Cunha Dep. at 244.) Therefore, NYHQ had a non-discriminatory reason for denying plaintiff's transfer request.

Plaintiff has not proffered any evidence to establish that this reason actually was due to retaliatory animus. *St. Francis Hosp.*, 281 F. Supp. 2d 548. Plaintiff has the burden of showing

pretext and she has not met this burden. *Id.* Plaintiff's mere dissatisfaction with her current departmental assignment does not constitute an adverse employment action to support a claim of retaliation. *Garber v. New York City Police Dep't,* No. 95 CIV. 251, 1997 WL 525396, at *7 (S.D.N.Y. Aug. 22, 1997), *aff'd,* 159 F.3d 1346 (2d Cir. 1998). Thus, a reasonable jury could not find that the denial of the transfer request back to OR was based upon any reason other than plaintiff's work record. *Id.*

Because plaintiff has failed to meet her burden of establishing by a preponderance of the evidence that the hospital engaged in any retaliatory conduct, summary judgement must be granted to the defendant.

## VI. Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The complaint is dismissed without costs to either party.

SO ORDERED.

DATED: Brooklyn, New York
March 3, 2006

/s/
DORA L. IRIZARRY
United States District Judge

19